UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID A. NADELL,

    Plaintiff,                                                    Case No.   2012 -

v.                                                                   Hon.

JACK COOPER TRANSPORT COMPANY, INC.,

    Defendant.

_____

**BOGAS, KONCIUS & CROSON P.C.**
KATHLEEN L. BOGAS (P25164)
BRIAN E. KONCIUS (P69278)
Attorneys for Plaintiff
31700 Telegraph Road, Suite 160
Bingham Farms, MI  48025
(248) 502-5000

_____

**COMPLAINT AND JURY DEMAND**

      Now comes Plaintiff DAVID A. NADELL, by and through his attorneys BOGAS, KONCIUS & CROSON P.C., brings his complaint as follows:

**JURISDICTIONAL ALLEGATIONS**

      1.     Plaintiff DAVID A. NADELL ("Plaintiff") is a resident of Parma, Michigan.

      2.     Defendant JACK COOPER TRANSPORT COMPANY, INC. ("Defendant") is a foreign Corporation organized under the laws of Delaware which conducts business in the City of Lansing, Ingham County, State of Michigan and thereby resides in Ingham County, Michigan, within the Western District of Michigan.

      3.     This is an action brought pursuant to the Americans with Disabilities Act ("ADA"), 42 USC §12101 *et seq.*, and the Michigan Persons with Disability Civil Rights Act

1

("PWDCRA"), MCL §37.1101, *et seq.*, seeking equitable, declaratory, injunctive relief and money damages against Defendant, as set forth herein.

4. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. § 1331, and pursuant to Americans with Disabilities Act ("ADA"), 42 USC §12101 *et seq*. This court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the state law claims of discrimination in violation of the Michigan Persons with Disability Civil Rights Act ("PWDCRA"), MCL §37.1101, *et seq.*

5. Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391, as it is the district where the Defendant conducts business, and many of the events giving rise to Plaintiff's claims took place.

6. The amount in controversy exceeds $75,000.

7. Plaintiff has exhausted his administrative remedies by filing an action with the Equal Employment Opportunity Commission ("EEOC") on or about April 25, 2011, alleging disability discrimination.

8. Plaintiff received a "Right to Sue" letter, dated on or about July 25, 2012, and received by Plaintiff on or about July 30, 2012.

9. Plaintiff has timely filed his lawsuit.

10. Defendant is an employer and Plaintiff was its employee within the meaning of Title I of the Americans with Disabilities Act ("ADA"), 42 USC §12101 *et seq.*, and the Michigan Persons with Disability Civil Rights Act ("PWDCRA"), MCL §37.1101, *et seq.*

## FACTUAL ALLEGATIONS

11. Plaintiff incorporates by reference herein the allegations contained in the foregoing paragraphs.

12. Plaintiff began his employment with Defendant in or around 2008.

13. At all times relevant hereto, Plaintiff performed his job diligently.

14. Plaintiff was subjected to disability discrimination by Defendant and/or by and through Defendant's agents, servants and/or employees, said acts being made unlawful by the Americans with Disabilities Act ("ADA"), 42 USC §12101 *et seq.*, and the Michigan Persons with Disability Civil Rights Act ("PWDCRA"), MCL §37.1101, *et seq*.

15. Further, Plaintiff has been subjected to retaliation by Defendant, by and through its agents, servants and/or employees, said acts being made unlawful by the Persons with Disabilities Civil Rights Act, MCLA 37.1101 *et seq.* ("PWDCRA").

16. On or about December 28, 2010, while driving his truck for Defendant, Plaintiff did not feel well and believed he was experiencing vertigo.

17. Plaintiff immediately pulled over to ensure the safety of Defendant's cargo, his own safety and the safety of the other drivers around him.

18. Plaintiff immediately informed Defendant of his decision to pull over.

19. Plaintiff delivered the load when he felt well and the episode had passed and returned to Defendant on December 29, 2010.

20. He was not dispatched for any more runs on the day he was returned.

21. Instead, on or about December 30, 2010, Plaintiff was sent to its WorkHealth Clinic by Defendant and saw David Walker, Physician's Assistant ("PA") at WorkHealth.

22. Plaintiff returned to its WorkHealth Clinic and saw a different doctor, Dr. George, on or about January 3, 2011.

23. At that time, the WorkHealth Clinic informed Plaintiff that it took him off of work for 60 days, told him to see a specialist, and provided records for Plaintiff to provide to the specialist.

24. Plaintiff saw his family doctor, Dr. Jones, on or about January 7, 2011, and was referred to an ear, nose and throat ("ENT") specialist, ENT Associates of Jackson, P.C. and Dr. Kirkner.

25. On or about January 25, 2011, Plaintiff saw ENT specialist, Dr. Kirkner.

26. That same day, Dr. Kirkner provided Plaintiff with a letter stating that he saw "no reason, because of the infrequency of the episodes, why [Plaintiff] should not be able to continue to drive as he has in the past without restrictions."

27. On or about February 25, 2011, Plaintiff visited the WorkHealth Clinic for the third time and saw PA Walker.

28. PA Walker reviewed Dr. Kirkner's report and refused to return Plaintiff to work or clear him for duty because of a passing reference to Meniere's disease and a failure to state definitively that Plaintiff does not have Meniere's disease.

29. PA Walker and Dr. Syrjamaki's notes from Plaintiff's visit indicate that they sent information to Defendant suggesting that Defendant ask that an IME be obtained by a specialist in Otolaryngology and recommending Dr. Bojrab from Michigan Ear Institute, P.L.L.C. and providing his contact information.

30. Plaintiff was not informed of the recommendation that an IME be conducted by a specialist in Otolaryngology, nor was Plaintiff provided with Dr. Bojrab's contact information.

31. On or about March 1, 2011, Plaintiff took Dr. Kirkner's letter directly to the company showing that the ENT specialist stated that he could return to work.

32. Plaintiff received no response.

33. On or about March 7, 2011, Plaintiff filed a grievance with Teamsters Local 580 because he had not heard from Defendant regarding returning him to work and a copy was provided to Defendant.

34. Plaintiff contacted Defendant about his work status and requested to review and copy his personnel file.

35. At that time, Defendant informed Plaintiff that it would not allow him to return to work because he did not have a valid Department of Transportation ("DOT") card, which was untrue because Plaintiff's DOT card was not revoked and was valid through August 27, 2011.

36. Plaintiff had been off over the 60 days required by the DOT regulations and was cleared to return to work by a specialist but was not allowed to do so by Defendant.

37. On or about March 18, 2011, the WorkHealth Clinic and PA Walker and Dr. George provided Defendant with a letter stating that they had "yet to get a definitive diagnosis that [Plaintiff's] recurring symptoms of vertigo are definitely NOT related to Meniere's disease. Because of this we have not been able to clear Mr. NaDell to operate a Tractor-Trailer for Jack Cooper."

38. Only through a grievance proceeding, and on or about March 28, 2011, Plaintiff received a copy of the communication from the WorkHealth Clinic sent to Defendant recommending that an IME be obtained by a specialist in Otolaryngology and suggesting Dr. Bojrab from Michigan Ear Institute, P.L.L.C. and providing Dr. Bojrab's contact information.

39. Plaintiff filed a Charge of Discrimination with the EEOC on or about April 25, 2011.

40. After that time, Defendants unreasonably continued to fail to return Plaintiff to work and to interfere with his ability to return to work as described more fully below.

41. On or about July 6, 2011, at a grievance hearing, a suggestion was made that an IME be obtained by a specialist in Otolaryngology and suggesting Dr. Bojrab from Michigan Ear Institute, P.L.L.C.

42. Defendant stated that it would consider this and respond to this option within days.

43. No reply was received from the Defendant into the middle of August 2011.

44. Plaintiff made an appointment with Dr. Bojrab on his own and at his own expense due to Defendant's failure to respond.

45. Upon information and belief, Defendant through its words and/or actions informed the Secretary/Treasurer and Business Agent of the Teamsters Local 580 that it would not accept any doctor's diagnosis regarding Plaintiff stating that he could return to work and did not have Meniere's disease, even Dr. Bojrab, the specialist recommended by its own WorkHealth Clinic.

46. On or about September 6, 2011, Plaintiff attended an appointment with Dr. Bojrab, wherein Dr. Bojrab stated testing needed to be done but that he does not believe that Plaintiff has either benign positional vertigo or Meniere's disease.

47. On or about September 16, 2011, Plaintiff returned for testing.

48. On or about September 20, 2011, Plaintiff returned to discuss the test results with Dr. Bojrab and was told that the outcome does not indicate Meniere's and Dr. Bojrab will write a letter advising all necessary parties of same.

49. Dr. Bojrab's office sent his letter and reports to Plaintiff and Defendant.

50. At another grievance meeting on or about October 20, 2011, Defendant received a copy of Dr. Bojrab's letter and reports.

51. On or about November 11, 2011, Plaintiff again spoke to Defendant about return to work and Defendant denied having knowledge of Dr. Bojrab's letter and report and did not return Plaintiff to work.

52. On or about December 5, 2011, Plaintiff went for and passed a DOT physical and was provided a renewed DOT card.

53. On or about December 6, 2011, Plaintiff was again denied a return to by Defendant who stated that Dr. Bojrab's letter and report was unacceptable to them because they did not agree to his selection, despite his being recommended to them by their own physicians at the WorkHealth Clinic.

54. Defendant further refused to accept Plaintiff's DOT card and falsely accused Plaintiff of shopping around to get approved.

55. Defendant refused to return Plaintiff.

56. Defendant stated that Plaintiff may only receive a DOT physical and receive a card from their physicians, the WorkHealth Clinic or they would consider it invalid.

57. On or about December 9, 2011, Plaintiff went to the WorkHealth Clinic for a DOT physical. Plaintiff handed previously received DOT physical paperwork and card as well as Dr. Bojrab's report to PA Walker. PA Walker called Defendant, refused to perform the physical on Plaintiff, and required Plaintiff to reschedule.

58. On or about December 14, 2011, Plaintiff returned to the WorkHealth Clinic for a physical.

59. During this visit, Dr. Syrjamaki, directly contrary to the physical performed days before by another office not associated with Defendant, found that Plaintiff was not cleared "due to episodes of vertigo" and noted that they were waiting for ENT despite the fact that Plaintiff had not experienced any vertigo since having to pull over almost a year prior in December 2010 and having been to two separate ENT and Otolaryngology specialists who had cleared him for work.

60. During December 2011- February 2012, Plaintiff continued to attempt to return to work but was not allowed to by Defendant.

61. Defendant insisted that Plaintiff see a specialist approved by them.

62. Defendant continued to delay in providing a specialist.

63. Finally, on or about March 7, 2012, Plaintiff was informed that the Defendant approved of a doctor and would make Plaintiff an appointment and inform him of the date.

64. Defendants made an appointment for Plaintiff and Plaintiff was seen by Dr. Munro on or about May 21, 2012.

65. During the appointment, Dr. Munro stated that a few episodes of vertigo in a lifetime does not equate to Meniere's disease.

66. On or about June 5, 2012, Dr. Munro provided Plaintiff and Defendant with a letter that concluded that Plaintiff does not have Meniere's disease and was fit for his occupation.

67. Finally, on or about June 8, 2012, Defendants sent Plaintiff a letter stating that he would be returned to work on June 11, 2012.

68. Plaintiff received no pay during this time.

69. Plaintiff received no payments into his pension system during this time.

70. Plaintiff received no credit toward his retirement during this time.

71. Plaintiff received no benefits during this time.

## Count I
## Discrimination In Violation of the ADA Based on Regarded As Having Disability

72. Plaintiff incorporates by reference the foregoing paragraphs and allegations.

73. At all relevant times, Plaintiff was an employee within the meaning of the ADA, 42 USC 12111 *et seq*.

74. At all relevant times, Defendant was a person within the meaning of the ADA and Defendant met all the requirements of employer status under the ADA.

75. At all relevant times, Plaintiff was regarded by Defendant as being a disabled individual under the ADA because of a perceived impairment as more fully described above, i.e., Meniere's disease and/or vertigo (despite multiple physicians and specialists clearing him to work).

76. The Defendant perceived that this medical impairment substantially limited Plaintiff's major life activity of driving and/or working.

77. Plaintiff's perceived disability was a motivating factor that contributed to Defendant's decision to remove Plaintiff from the work schedule and refusal to return him to work despite multiple physicians and specialists clearing him to work.

78. Plaintiff, with or without reasonable accommodations, was able to perform all of the duties and responsibilities associated with her job.

79. Defendant failed to properly accommodate Plaintiff, and failed to return him to work in violation of the ADA.

80. Defendant violated the aforementioned ADA by, *inter alia*, the following acts:

   a. Failing to return to work or otherwise limiting, segregating, or classifying Plaintiff in a way that adversely affected the opportunities or status of Plaintiff because of Defendant regarding him as having a disability;

      b. Denying employment opportunities to Plaintiff based on Defendant regarding him as having a disability;

      c. Subjecting Plaintiff to disparate treatment and harassment on the basis of Defendant regarding him as having a disability; and/or

      d. Creating and subjecting Plaintiff to a hostile environment on the basis of Defendant regarding him as having a disability.

81. Defendants engaged in said discriminatory practices with malice or reckless indifference to the federally protected rights of Plaintiff.

82. As a direct and proximate result of Defendant's discrimination in violation of the ADA, Plaintiff has suffered bodily injury, physical impairment, feelings of depression, loss of standing in the community and among his peers and family, emotional and physical distress, mental and physical anguish, humiliation and embarrassment and the physical manifestations thereof, and will so suffer in the future.

83. As a further direct and proximate result of Defendant's retaliation, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, a loss and impairment of her earning capacity and ability to work, and will so suffer in the future; he has been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

WHEREFORE, Plaintiff DAVID A. NADELL prays that this Honorable Court grant the following remedies:

    a. Declare that the aforementioned practices and actions of Defendant constitute unlawful employment practices in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

    b. Award Plaintiff all lost wages and benefits, past and future, to which he is entitled;

    c. Award Plaintiff compensatory damages;

  d.  Award Plaintiff punitive and exemplary damages;

  e.  Award Plaintiff reasonable attorney's fees, costs, and interest;

  f.  Award Plaintiff injunctive relief, including but not limited to fully funding his pension and awarding him time credit towards retirement and pension eligibility for the time Defendants kept Plaintiff out of work.

  g.  Award such other relief as this Court deems just and proper.

## Count II
### Discrimination In Violation of the PWDCRA Based on Regarded As Having Disability

84. Plaintiff incorporates by reference the foregoing paragraphs and allegations.

85. At all relevant times, Plaintiff was an employee under the Michigan Persons with Disability Civil Rights Act, M.C.L.A 37.1101, *et seq.* ("PWDCRA").

86. At all relevant times, Defendant was an employer under the PWDCRA.

87. Defendant regarded Plaintiff as a person with a disability, as more fully described above, i.e., Meniere's disease and/or vertigo (despite multiple physicians and specialists clearing him to work).

88. Plaintiff's perceived disability was a motivating factor that contributed to Defendant's decision to remove Plaintiff from the work schedule and refusal to return him to work despite multiple physicians and specialists clearing him to work.

89. Plaintiff, with or without reasonable accommodations, was able to perform all of the duties and responsibilities associated with his job.

90. Defendant failed to properly accommodate Plaintiff, and return him to work in violation of the PWDCRA.

91. Defendant violated the aforementioned PWDCRA by, *inter alia*, the following acts:

  a. Failing to return to work or otherwise limiting, segregating, or classifying Plaintiff in a way that adversely affected the opportunities or status of Plaintiff because of Defendant regarding him as having a disability;

  b. Denying employment opportunities to Plaintiff based on Defendant regarding him as having a disability;

  c. Subjecting Plaintiff to disparate treatment and harassment on the basis of Defendant regarding him as having a disability; and/or

  d. Creating and subjecting Plaintiff to a hostile environment on the basis of Defendant regarding him as having a disability.

92. Defendants engaged in said discriminatory practices with malice or reckless indifference to the protected rights of Plaintiff.

93. As a direct and proximate result of Defendant's discrimination in violation of the PWDCRA, Plaintiff has suffered bodily injury, physical impairment, feelings of depression, loss of standing in the community and among his peers and family, emotional and physical distress, mental and physical anguish, humiliation and embarrassment and the physical manifestations thereof, and will so suffer in the future.

94. As a further direct and proximate result of Defendant's retaliation, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, a loss and impairment of her earning capacity and ability to work, and will so suffer in the future; he has been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

WHEREFORE, Plaintiff DAVID A. NADELL prays that this Honorable Court grant the following remedies:

  a. Declare that the aforementioned practices and actions of Defendant constitute unlawful employment practices in violation of the Persons with Disabilities Civil Rights Act;

    b.      Award Plaintiff all lost wages and benefits, past and future, to which he is entitled;

    c.      Award Plaintiff compensatory damages;

    d.      Award Plaintiff punitive and exemplary damages;

    e.      Award Plaintiff reasonable attorney's fees, costs, and interest;

    f.      Award Plaintiff injunctive relief, including but not limited to fully funding his pension and awarding him time credit towards retirement and pension eligibility for the time Defendants kept Plaintiff out of work.

    g.      Award such other relief as this Court deems just and proper.

## Count III
## Retaliation and/or Interference In Violation of both the ADA and PWDCRA

95.    Plaintiff incorporates by reference the foregoing paragraphs.

96.    During the time Plaintiff was employed by Defendant, Plaintiff engaged in protected activity under the ADA and PWDCRA, <u>to wit</u>, Plaintiff opposed acts and practices made unlawful by the ADA and PWDCRA including, but not limited to, discriminating against Plaintiff by failing to return him to work, and ultimately Plaintiff filed a grievance and Charge of Discrimination with the EEOC.

97.    Defendant retaliated, interfered with, and discriminated against Plaintiff for engaging in said protected by activity by, *inter alia*, continuing to interfere with Plaintiff's ability to return to work and failing to return Plaintiff to work after filing a grievance and Charge of Discrimination with the EEOC.

98.    As a direct and proximate result of Defendants' retaliation and interference in violation of the ADA and PWDCRA, Plaintiff has suffered bodily injury, physical impairment, feelings of depression, loss of reputation and standing in the community and among his peers and

family, emotional and physical distress, mental and physical anguish, humiliation and embarrassment and the physical manifestations thereof, and will so suffer in the future.

99. As a further direct and proximate result of Defendants' retaliation and interference, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, a loss and impairment of his earning capacity and ability to work, and will so suffer in the future; he has been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

WHEREFORE, Plaintiff DAVID A. NADELL prays that this Honorable Court grant the following remedies:

- a. Declare that the aforementioned practices and actions of Defendant constitute unlawful employment practices in violation of the Americans with Disabilities Act and the Persons with Disabilities Civil Rights Act;
- b. Award Plaintiff all lost wages and benefits, past and future, to which he is entitled;
- c. Award Plaintiff compensatory damages;
- d. Award Plaintiff punitive and exemplary damages;
- e. Award Plaintiff reasonable attorney's fees, costs, and interest;
- f. Award Plaintiff injunctive relief, including but not limited to fully funding his pension and awarding him time credit towards retirement and pension eligibility for the time Defendants kept Plaintiff out of work.
- g. Award such other relief as this Court deems just and proper.

**WHEREFORE**, Plaintiff DAVID A. NADELL respectfully requests that this Court enter judgment against Defendant and all relief requested in this Complaint.

                                **BOGAS, KONCIUS & CROSON P.C.**

By: /s/Brian E. Koncius
     KATHLEEN L. BOGAS (P25164)
     BRIAN E. KONCIUS (P69278)
     Attorneys for Plaintiff
     31700 Telegraph Rd, Ste 160
     Bingham Farms, MI 48025
     (248) 502-5000

Date: October 23, 2012      office@kbogaslaw.com

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DAVID A. NADELL,

      Plaintiff,                                         Case No. 2012-

v.                                                            Hon.

JACK COOPER TRANSPORT COMPANY, INC.,

      Defendant.
_____

**BOGAS, KONCIUS & CROSON P.C.**
KATHLEEN L. BOGAS (P25164)
BRIAN E. KONCIUS (P69278)
Attorneys for Plaintiff
31700 Telegraph Road, Suite 160
Bingham Farms, MI  48025
(248) 502-5000

_____

## DEMAND FOR JURY TRIAL

    NOW COMES Plaintiff, DAVID A. NADELL, by and through his attorneys, BOGAS, KONCIUS & CROSON P.C., and hereby demands a jury trial in the above-captioned matter.

                                 **BOGAS, KONCIUS & CROSON P.C.**

                                 By:    /s/Brian E. Koncius
                                           KATHLEEN L. BOGAS (P25164)
                                           BRIAN E. KONCIUS (P69278)
                                           Attorneys for Plaintiff
                                           31700 Telegraph Rd, Ste 160
                                           Bingham Farms, MI  48025
                                           (248) 502-5000
Date:  October 23, 2012                   office@kbogaslaw.com